AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Louisiana

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
IN THE MATTER OF THE SEARCH OF DOC-YOUR-DOSE ) Case No. 15- 71 - UNA
PHARMACY LOCATED AT 17275 HIGHWAY 77, )
GROSSE TETE, LOUISIANA 70740 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the          Middle          District of          Louisiana          , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 331(a), 331(k), and 331(t); 18 U.S.C. §§ 371 and 1347 | Introduction of Misbranded Drugs into Interstate Commerce; Doing an Act Which Results in Drugs Being Misbranded While Held for Sale; Unlicensed Wholesaling of Prescription Drugs & Failure to Provide a Pedigree for Drugs Sold; Conspiracy and Health Care Fraud |

The application is based on these facts:

### SEE AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of          days (give exact ending date if more than 30 days:          ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Alex Davis, Special Agent
*Printed name and title*

Sworn to before me ~~and signed in my presence.~~

Date:          05/04/2015

*Judge's signature*

City and state:   Baton Rouge, Louisiana

Richard L. Bourgeois, Jr., Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH | : | CASE NO. 15- 71 - UNA |
| OF DOC-YOUR-DOSE PHARMACY | : | |
| LOCATED AT 17275 HIGHWAY 77, | : | **UNDER SEAL** |
| GROSSE TETE, LOUISIANA 70740 | : | |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

### INTRODUCTION

1.      I make this affidavit in support of an application for a warrant to search the business known as Doc-Your-Dose Pharmacy located at 17275 Highway 77, Grosse Tete, LA 70740 (hereinafter the "SUBJECT PREMISES"), more particularly described in Attachment A, which is located in the Middle District of Louisiana. The purpose of this application is to search for and seize evidence, more particularly described below and in Attachment B, as evidence, fruits and instrumentalities of criminal activity.

### AGENT BACKGROUND

2.      I am a Special Agent (SA) with the United States Food and Drug Administration (FDA), Office of Criminal Investigations (OCI), and have been so employed since June, 2004. Prior to my employment with FDA/OCI, I was employed as a Special Agent with the United States Secret Service (USSS) for approximately four years. Prior to my employment with the USSS, I was employed as a State Trooper with the Louisiana State Police (LSP) for approximately four years. While employed with LSP, I served for approximately two years as a narcotics agent.

1

3.      As a SA with FDA/OCI, I have conducted and participated in numerous investigations involving criminal violations of the Federal Food, Drug, and Cosmetic Act (FDCA), Title 21, United States Code, Section 301, *et. seq.*, and other federal criminal statutes related to FDCA violations (including money laundering, mail fraud, wire fraud, and health care fraud).  During that time, I have, among other things, examined records, executed search warrants, interviewed suspects and used a variety of other techniques and resources to further investigations.  I have also attended training involving health care fraud and prescription drug diversion investigations.  As a result of my training and experience, I am familiar with the federal laws relating to health care fraud and drug diversion, as well as common fraud techniques and schemes involving both.

4.      Based on my training and experience and the facts as set forth in this affidavit, I have probable cause to believe that evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 331(a) (Introduction of Misbranded drugs into Interstate Commerce), 331(k) (Doing an Act which Results in Drugs being Misbranded While Held for Sale), and 331(t) (Unlicensed Wholesaling of Prescription Drugs and Failure to Provide a Pedigree for Drugs Sold); Title 18 , United States Code, Section 371 (Conspiracy); and Title 18, , United States Code, Section 1347 (Health Care Fraud), as well as related contraband, are located within the SUBJECT PREMISES.  I seek authority to seize any evidence, fruits, contraband, and instrumentalities of the foregoing criminal violations, as well as any conspiracy to violate the foregoing, located within the SUBJECT PREMISES to be searched.  I request authority to search any computer and computer media located within the entire SUBJECT PREMISES where the items specified in Attachment B may be

2

found, and to seize all items listed in Attachment B as evidence, fruits, contraband, and instrumentalities of crime.

5.     The information contained in this affidavit is based on:  my personal knowledge, experience, and observations; information provided by federal and other law enforcement agents; written reports that I have received, directly or indirectly, from other law enforcement agents; information gathered from the service of administrative subpoenas and search warrants; and the results of physical surveillance conducted by federal and other law enforcement agents.  This affidavit includes only those facts that I believe are necessary to establish probable cause and does not include all of the facts uncovered during the investigation.

## RELEVANT LAW

6.     Title 21, United States Code, Section 321 (g) defines the term "drug" as, among other things, articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and articles (other than food) intended to affect the structure or any function of the body of man or other animals; and articles intended for use as a component of another drug.

7.     Title 21, United States Code, Section 353(b)(1), defines a prescription drug as, among other things, a drug intended for use by man which because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or a drug which is limited by an approved application under Title 21 United States Code, Section 355 to use under the professional supervision of a practitioner licensed by law to administer such drug.

3

8.     The products to be described later in this affidavit, which are involved in this case, include Atripla, Complera, Epzicom, Lexiva 700mg, Norvir 100mg, Prezista (400mg, 600mg and 800mg); Prezista (400mg, 600mg and 800mg), Reyataz 300mg, Sustiva 600mg, Truvada, Ziagen 300mg.  All these products meet the definition of a drug found at Title 21, United States Code, Section 321(g), and also meet the definition of prescription drugs at Title 21, United States Code, Section 353(b)(1).

9.     The FDCA defines "label" as a display of written, printed, or graphic matter upon the immediate container of any article.  21 U.S.C. § 321(k).   The term "labeling" is defined as all labels and other printed or graphic matter upon any article or any of its containers or wrappers, or accompanying such article.  21 U.S.C. § 321(m).

10.     During the relevant time period, the wholesale distribution of prescription drugs meant distribution to someone other than a consumer or patient.  21 U.S.C. § 353(e)(3)(B).  Title 21, United States Code, Section 353(e)(2)(A)[1] provided that no person could engage in the wholesale distribution in interstate commerce of prescription drugs in a particular state unless that person was licensed by that same state.

11.     Wholesale distributors of prescription drugs, other than an authorized distributor of record, were required to provide to any person who received drugs from the distributor a statement identifying each prior sale, purchase or trade of the drug, including the

---

[1] This affidavit reflects the prescription drug wholesaling laws in effect at the time the activity described occurred.  In November 2013, Congress passed the Drug and Quality Security Act (DQSA), which created new requirements for the distribution of prescription drugs in the United States.  Among the changes were new requirements for licensure of prescription drug wholesalers; licensure (by either the state or the FDA) is still mandatory, but the new requirements for wholesalers are much more extensive and in many cases, stricter.  However, the new laws did not go into effect until January 1, 2015; thus, the new law does not apply to the time period in which the wholesaling activity described occurred.

date of the transaction and the names and addresses of all parties to the transaction. 21

U.S.C. § 353(e)(1). This document was commonly referred to as the drug "pedigree."

12.     The distribution of drugs in violation of Title 21, United States Code, Section

353(e), or the failure to otherwise comply with the requirements of Section 353(e), was

prohibited. 21 U.S.C. § 331(t). Any person who violated Title 21, United States Code,

Section 331(t) by knowingly distributing drugs in violation of Title 21, United States Code,

Section 353(e)(2)(A) is punishable by imprisonment for not more than 10 years, fined not

more than $250,000, or both. 21 U.S.C. § 333(b)(1)(D)[2].

13.     A drug was misbranded if, among other things, it lacked adequate directions

for use. 21 U.S.C. § 352(f)(1). "Adequate directions for use" means directions under which

a layman can use a drug or device safely and for the purposes for which it is intended. 21

C.F.R. § 201.5. It is not possible to write adequate directions for use by a layperson for any

prescription drugs, since by definition they can only be safely used under a medical

practitioner's supervision. Approved prescription drugs in the possession of a person (or the

agent of such person) normally and lawfully engaged in the manufacture, storage, holding or

wholesaling of prescription drugs are exempt from Title 21, United States Code, Section

352(f)(1), but otherwise, all prescription drugs are misbranded for lacking adequate

directions for use by a layperson.

14.     The introduction into interstate commerce of a misbranded drug was

prohibited. 21 U.S.C. § 331(a).

---

[2] This provision also changed after January 1, 2015 to reflect the new wholesaling licensing provisions of
the DQSA.

15.     The doing of any act which resulted in a drug becoming misbranded while held for sale after its shipment in interstate commerce was prohibited. 21 U.S.C. § 331(k).

16.     Any violation of Title 21, United States Code, Section 331 is a Class A misdemeanor subject to a maximum penalty of one year in prison and a $100,000 fine or both, 21 U.S.C. Section 333(a)(1), 18 U.S.C. Section 3571. Such violations are also strict liability misdemeanors, meaning no *mens rea* is required for criminal liability. *United States v. Park*, 421 U.S. 658 (1975). However, if any violation of Title 21, United States Code, Section 331 is done with the intent to defraud and mislead, it is a felony, punishable by imprisonment of three years, a penalty of up to $250,000 for an individual, or both. 21 U.S.C. § 333(a)(2); 18 U.S.C. § 3571. "Intent to defraud and mislead" means intent to defraud and mislead consumers, or any intent to defraud or mislead law enforcement or regulatory authorities.

17.     Title 18, United States Code, Section 371 provides that if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, such persons are criminally liable for fines under Title 18, United States Code, Section 3571, imprisonment of not more than five years, or both. If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

18.     Pursuant to Title 18, United States Code, Section 1347, it is unlawful for anyone to knowingly and willfully execute, or attempt to execute, a scheme or artifice to defraud any health care benefit program; or to obtain, by means of false or fraudulent

6

pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. A person need not have actual knowledge of this section or specific intent to commit a violation of this section. Such crimes are punishable by fines as established in Title 18, United States Code, Section 3571, or imprisonment of not more than 10 years, or both. If the violation results in serious bodily injury, the maximum term of imprisonment is not more than 20 years, and if the violation results in death, the violator may be imprisoned for any term of years or for life.

## OVERVIEW OF FEDERALLY-FUNDED PRESCRIPTION DRUG PROGRAMS AND PRESCRIPTION DRUG DIVERSON

19.     Based on my training and experience, as well as information I have gained from other agents regarding investigations involving federally funded prescription drug programs for consumers, including the Medicaid program, and drug diversion, I know the following:

a.      The Medicaid program is a federal and state health care program that provides health care benefits to individuals and families who meet specified financial and other eligibility requirements, and certain other individuals who lack adequate resources to pay for medical care. The Louisiana Department of Health and Hospitals (LA DHH) is responsible for overseeing the Medicaid program in the State of Louisiana. Individuals who receive benefits under Medicaid are referred to as "beneficiaries."

b.      The LA DHH is statutorily authorized by the State of Louisiana to enter into contracts with entities, known as "providers," who render medical or

7

medically related services to Medicaid beneficiaries. Examples of such providers include, but are not limited to, physicians, medical clinics, hospitals and pharmacies. In order for a provider to receive payments for the services they render to Medicaid beneficiaries, they are required to submit a claim to Molina Medicaid Solutions (Molina), the Louisiana fiscal intermediary for the Medicaid Program. The claims that are submitted to Molina for reimbursement contain detailed information about the services rendered by the provider to the beneficiary. Some of the information found on a claim includes the beneficiary's name, the date of service, the National Drug Code (NDC) of any drugs provided, and the prescribing physician.

c.      Molina electronically receives and processes all Medicaid Program claims at its office located in East Baton Rouge Parish, and subsequently remits payments to the providers via wire transfers.

d.      During the normal course of legitimate retail drug distribution, state-licensed retail pharmacies[3] purchase the prescription drugs they dispense to patients from state-licensed wholesale pharmacies ("wholesalers").  As a result of these drug purchases, the pharmacies receive wholesaler purchase invoices as a record of their purchase.

### STATUTORY DUTY TO PRESERVE RECORDS

e.      Louisiana Revised Statutes, Title 46:437.1-46, requires Medicaid providers to, among other things, maintain and retain the following records for

---

[3] In most states, some physicians, hospitals, and other health care providers may also legitimately purchase prescription drugs from licensed wholesale pharmacies and hold those drugs for dispensing to their patients pursuant to a valid prescription.

8

a period of at least five (5) years; Medicaid claim forms and any documents that are attached; Professional records, such as patient treatment plans and patient records; Prior and post authorization, and service authorization information; Prescription records for Medicaid as well as those for all other patients (including Medicare, private pay and cash); Business records, such as accounting ledgers, financial statements, purchase/acquisition records, invoices, inventory records, check registers, canceled checks, sales records, etc.; Tax records, including purchase documentation; and Provider enrollment documentation.

f.      With regards to the retention of prescription records, Title 46:437.1-46 further requires Medicaid providers to maintain a patient record for each recipient for whom new or refill prescriptions are dispensed. The pharmacy's patient record system must provide for the immediate retrieval of the information necessary for the pharmacist to identify previously dispensed drugs when dispensing a new or refill prescription. Additionally, all prescription records must be maintained within an electronic record keeping system, in accordance with the Louisiana Board of Pharmacy regulations, as referenced below in paragraph h.

g.      Louisiana Administrative Code (LAC), Title 46:1121(A) - (C), of the Louisiana Board of Pharmacy's rules, requires pharmacies to maintain and retain the following complete, accurate, and readily retrievable prescription drug records for a period of at least two (2) years; All prescription drug transactions, consisting of: acquisition records – invoice receipts of drugs

9

acquired; disposition records – prescription orders dispensed or drugs sold; and inventory records – drugs in current possession.

h.      Louisiana Administrative Code (LAC) Title 46:1103, of the Louisiana Board of Pharmacy's rules, requires that all pharmacy departments utilize an electronic record keeping system which is complete, accurate, and is a readily retrievable prescription record keeping and storage system.

i.      When dispensing drugs to their customers, retail pharmacies affix patient labels to the drug bottles that display, among other things, identifying information about the pharmacy and patient, as well as dosage instructions for the patient.

j.      When a beneficiary of Medicaid seeks to obtain prescription drugs from a pharmacy, the pharmacy provides the drugs to the beneficiary at little or no cost to the beneficiary.  The cost to the pharmacy is typically reimbursed in whole or in part by the Medicaid program.

k.      The 340B Drug Discount Program is a U.S. federal government program that requires drug manufacturers participating in Medicaid to provide outpatient prescription drugs to eligible health care organizations/covered entities that have been approved by the  Department of Health and Human Services (HHS), known as "covered entities," at or below statutorily defined discount prices (340B ceiling prices).  Covered entities may purchase and dispense drugs under the 340B Program through in-house pharmacies, or they may enter into contracts with retail pharmacies to dispense 340B-purchased drugs on their behalf.

10

l.      Covered entities may purchase drugs at or below 340B ceiling prices. The 340B ceiling price is calculated using a statutorily defined formula based on the average manufacturer price (AMP) of drugs - the average price paid to drug manufacturers for drugs distributed to retail community pharmacies. Drug manufacturers must calculate and report AMP to the Centers for Medicare & Medicaid Services (CMS). The 340B ceiling price of a drug is generally much lower than its retail price.

m.      Once an FDA-approved prescription drug enters the wholesale distribution market, it can pass through many wholesalers before reaching a retail pharmacy. This fact creates opportunities for criminals to insert questionable, if not completely illegitimate, products into the legitimate supply chain. Within the wholesale distribution market of prescription drugs, a sub-market, commonly referred to as the "diversion market" exists. The practices within the "diversion market" include the illegal distribution of drug samples, the use of coupons redeemable for prescription drugs at no cost, the sale of stolen prescription drugs, the sale of expired prescription drugs, the unlawful diversion of deeply discounted drugs that were intended for hospitals and health care entities such as clinics, and the purchase of filled prescriptions from patients who receive drugs through social welfare programs. These practices have helped fuel a multi-billion dollar drug diversion market that provides a portal through which potentially dangerous misbranded, sub-potent, adulterated, expired, and counterfeit drugs enter the nation's drug distribution system.

11

n.     Among other potential dangers to consumers, diverted drugs may have been stored in uncontrolled conditions, which may not be sufficient to maintain the medical efficacy of such drugs over time, and the drugs themselves may have expired.  For example, some HIV medications require constant storage in conditions between 25 and 30 degrees Celsius to maintain their efficacy.

o.     Diverted drugs, which can often be purchased for a price lower than the same prescription drug's wholesale price from a legitimate source, are eventually sold to customers and billed at the legitimate drug's retail value. Schemes involving the distribution of diverted drugs can also result in Medicaid being defrauded.  Moreover, these health care benefit programs, as well as insurance companies, would not knowingly reimburse pharmacies the cost of diverted drugs being sold to customers.

## PROBABLE CAUSE OF PRESCRIPTION DRUG DIVERSON

20.     On Thursday, September 12, 2013, at approximately 4:15 PM, Troy Taylor and Broderick Landry were stopped for a traffic violation in Bradley County, Tennessee. Taylor and Landry were arrested after a canine alerted on their rental vehicle and a subsequent search revealed two bags in the vehicle's trunk containing what appeared to be the following FDA-approved prescription drugs:

| Drug name | Number of bottles & tablets | Medical use |
|-----------|-----------------------------|-------------|
| Atripla | 12 bottles/ 30 tablets per | HIV Drug |
| Complera | 5 bottles/ 30 tablets per | HIV Drug |

| | | |
|---|---|---|
| Epzicom | 12 bottles/ 30 tablets per | HIV Drug |
| Lexiva 700mg | 6 bottles/ 60 tablets per | HIV Drug |
| Norvir 100mg | 14 bottles/ 30 tablets per | HIV Drug |
| Prezista 400mg, 600mg and 800mg | 8 bottles/ 60 tablets per | HIV Drug |
| Prezista 400mg, 600mg and 800mg | 6 bottles/ 30 tablets per | HIV Drug |
| Reyataz 300mg | 8 bottles/ 30 tablets per | HIV Drug |
| Sustiva 600mg | 6 bottles/ 30 tablets per | HIV Drug |
| Truvada | 12 bottles/ 30 tablets per | HIV Drug |
| Ziagen 300mg | 5 bottles/ 60 tablets per | HIV Drug |

21.     The above listed prescription drugs were contained within what appeared to be the drug manufacturer's original packaging and did not display any patient labeling or any other indication that the drugs had been previously dispensed.

22.     During questioning, Taylor, in part, stated that he and Landry had recently traveled from Louisiana to Washington D.C., where they purchased the above-listed prescription HIV-related drugs for his employer, pharmacist Alvin Watts. Taylor advised that they were attempting to return to Louisiana in order to deliver the drugs to the SUBJECT PREMISES when they were stopped. Taylor further explained that while he was in Washington, D.C. he met with a man known to him as "Frank" at a McDonald's restaurant and he gave "Frank" an envelope containing about $10,000.00 in exchange for the HIV-related drugs. Taylor stated that Alvin Watts had given him the money to give to "Frank." Neither Taylor nor Landry provided a wholesaler invoice, pedigree or any other

13

documentation of the drug transaction Taylor conducted with "Frank," and no drug invoices, pedigrees or other documentation were found in their vehicle or on their persons.

23.     Also during questioning, Taylor stated that he traveled to D.C. once a month to pick up prescription drugs for his boss, Alvin Watts, and that he had previously made about four or five similar trips for Watts. Taylor said that Landry had traveled with him to Washington, D.C. during three of his previous trips. Taylor explained that after he drops off the prescription drugs to Alvin Watts, Watts puts the drugs into prescription bottles so it can be distributed to patients. Taylor also said that Watt's business partner, D. Brown, was unaware of his trips to D.C. to obtain the prescription drugs.

24.     On September 16, 2013, an officer from Tennessee's 10th Judicial Drug Task Force contacted FDA/OCI and informed your affiant of the aforementioned arrest of Taylor and Landry and of the subsequent seizure of a large quantity of illegally obtained prescription drugs which are used to treat the HIV infection.

25.     On September 17, 2013, your affiant queried the Louisiana Secretary of State's commercial database for information on the SUBJECT PREMISES. The database identified Alvin Watts III as a registered agent and Darlene Brown as an officer of Doc-Your-Dose Pharmacy, LLC., Charter Number 36702559K, located at the SUBJECT PREMISES. The database also indicated the business is an active limited liability company that was registered with the Louisiana Secretary of State on March 27, 2008.

26.     On September 18, 2013, at your affiant's request, the Louisiana Board of Pharmacy (LABP) confirmed that, as of March 20, 2008, Doc-Your-Dose Pharmacy, located at the SUBJECT PREMISES was registered with their agency as an independent community pharmacy (retail pharmacy). The LABP also confirmed that since May 23, 2007, Watts had

been a registered and licensed pharmacist in the state of Louisiana and was also listed as the

co-owner, along with Pharmacist Darlene Brown, of Doc-Your-Dose Pharmacy.

27. On September 18, 2013, the LABP provided your affiant with an estimated

wholesale market value of the HIV-related drugs which had been seized from Taylor and

Landry (had they been purchased from legitimate wholesale sources) to be as follows:

| Drug name | Number of bottles & tablets | Wholesale price per bottle | Wholesale price total |
|---|---|---|---|
| Atripla | 12 bottles/ 30 tablets per | $ 2,462.35 | $ 29,548.20 |
| Complera | 5 bottles/ 30 tablets per | $ 2,463.37 | $ 12,316.85 |
| Epzicom | 12 bottles/ 30 tablets per | $ 1,324.91 | $ 15,898.92 |
| Lexiva 700mg | 6 bottles/ 60 tablets per | $ 1,126.67 | $ 6,760.02 |
| Norvir 100mg | 14 bottles/ 30 tablets per | $ 324.85 | $ 4,547.90 |
| Prezista 400mg, 600mg, 800mg | 8 bottles/ 60 tablets per | $ 1,420.97 | $ 11,367.76 |
| Prezista 400mg, 600mg, 800mg | 6 bottles/ 30 tablets per | $ 1,420.97 | $ 8,525.82 |
| Reyataz 300mg | 8 bottles/ 30 tablets per | $ 1,409.38 | $ 11,275.04 |
| Sustiva 600mg | 6 bottles/ 30 tablets per | $ 922.48 | $ 5,534.88 |
| Truvada | 12 bottles/ 30 tablets per | $ 1,539.90 | $ 18,478.80 |
| Ziagen 300mg | 5 bottles/ 60 tablets per | $ 564.23 | $ 2,821.15 |
| | | | $127,075.34 |

28. On September 19, 2013, a Tennessee state search warrant was executed on

four cellular telephones that had been seized from Taylor and Landry during their arrest on

September 12, 2013. As a result of the search warrant, your affiant observed that one of the

four telephones searched, assigned the telephone number 225-328-4070, displayed a text message indicating it had been activated in the name "Troy" on September 10, 2013.

29.    Upon reviewing the text messages obtained through the search warrant for the cellular telephone 225-328-4070, your affiant identified twelve text messages that had been sent to and from a Maryland telephone number, 301-741-6305, on Monday, September 10, 2013. The telephone number 301-741-6305 was later identified, though subpoenaed records, as being assigned to Troy Weaver, a resident of Fort Washington, Maryland.

30.    Upon further review of the text messages obtained through the search warrant for the cellular telephone 225-328-4070, your affiant observed that the twelve text messages discussed arrangements for a $10,000.00 purchase of HIV-related drugs. The text messages also referenced a previous drug transaction for $12,500.00. The twelve text messages were displayed as follows:

**From Weaver to Taylor:** "Damn! lol gon need a bigger bag.. what $ like?"

**From Taylor to Weaver:** "Whats a good number for you"

**From Weaver to Taylor:** "20... that 800 isa problem.. but i can make it happen for 20... if not gon have to cut that one back"

**From Weaver to Taylor:** "n of course ill throw in whateva extra shit i got wit 20"

**From Taylor to Weaver:** "Im going to tell him"

**From Taylor to Weaver:** "New list. Prz 800 trvada atrpl epzcm nrvir tab. 13. Combiv abacavir 5. Sustiva reyataz 300 6 lex4va przsta 600 2"

**From Weaver to Taylor:** "ok.. what yall workin wit?$"

**From Taylor to Weaver:** "10000 its hard to pull more the other owner starting to ask questions"

**From Weaver to Taylor:** "damn...yall cant do the 12,5 again? ill make the 13s into 15,s"

16

**From Weaver to Taylor:** "just tryna make it more since this might be last time.. but if all yall can do is 10... thats cool... Friday?"

**From Taylor to Weaver:** "I feel ya but its tight as hell we will be there Thursday"

**From Weaver to Taylor:** "no prob.... gettin it together now"

31.     As a result of the aforementioned traffic stop conducted on September 12, 2013, Taylor provided officers with a copy of his vehicle's Enterprise rental form. Upon reviewing the Enterprise vehicle rental form, your affiant observed that the vehicle was rented by Troy Taylor on September 11, 2013, and the vehicle's rental type was displayed on the form as "retail pharmacal" [sic].

## PROBABLE CAUSE OF PRESCRIPTION FRAUD AND MEDICAID FRAUD

32.     On December 20, 2013, the Louisiana Department of Justice's Medicaid Control Fraud Unit (LA MFCU) received a criminal complaint from Louisiana Department of Health and Hospitals (LA DHH) advising that Doc-Your-Dose Pharmacy  located at SUBJECT PREMISES had billed Medicaid for prescriptions for two Medicaid beneficiaries after their deaths.

33.     On January 22, 2014, upon reviewing the medical billing reports obtained from the LA DHH Program Integrity (PI) Unit, LA MFCU Investigators observed that prescription drugs were billed by the Doc-Your-Dose Pharmacy for two Medicaid beneficiaries after their date of their death. The two deceased Medicaid beneficiaries will be identified herein as S.M. and A.L. The medical billing reports revealed that Doc-Your-Dose Pharmacy billed for fourteen prescriptions of various prescription drugs for S.M. after she

died in early June 2012. All fourteen claims were purportedly prescribed by practitioners at Capital City Clinic, 3140 Florida St, Baton Rouge, LA 70806, from June 25, 2012 to July 8, 2012.

34.     The medical billing reports obtained from the LA DHH PI Unit also identified a claim, submitted by Doc-Your-Dose Pharmacy, for a prescription of Seroquel/100mg that was reportedly prescribed on June 25, 2012 by Dr. Walter Campbell, a physician employed at the Capital City Clinic.

35.     The medical billing reports further revealed that Doc-Your-Dose Pharmacy had submitted claims for two prescriptions of various medications reportedly prescribed by Nurse Practitioner (NP) Joni Nickens to A.L. on August 20, 2012, occurring after A.L.'s death in early August 2012. The report further identified NP Joni Nickens as a Nurse Practitioner with The Caring Clinic, located at 4550 North Blvd, Baton Rouge, LA 70806.

36.     On June 24, 2014, in response to the LA DHH PI Unit's investigation of the prescriptions that had been posthumously prescribed for S.M. and A. L., the LA DHH Pharmacy Services initiated two audits of Doc-Your-Dose Pharmacy: a prescriber verification/script audit and an invoice audit comparing invoices from November 1, 2012 to December 31, 2012, to claims of service dated from January 1, 2013 to December 31, 2013.

37.     In an effort to narrow their verification/script audit of Doc-Your-Dose Pharmacy, the LA DHH focused their audit on ten physicians who were chosen by the quantity of prescriptions written and the types of drugs prescribed. The LA DHH identified 1,038 prescriptions which had been prescribed by those ten physicians. Upon contacting the ten chosen physicians, LA DHH received written responses from eight of the ten. Two of the ten physicians, Dr. Lynn Simon and Dr. Corey Hall, failed to respond despite multiple

attempts by the LA DHH to contact them. The eight responding physicians identified a total of approximately 552 prescriptions which they had not authorized, but had been verified by the LA DHH as reimbursed claims that had been submitted to Medicaid by Doc-Your-Dose Pharmacy.

38.     As a result of the LA DHH's verification/script audit, LA MFCU Investigators were informed by Dara Horcasitas, a contract employee with LA DHH, that many of the HIV drugs dispensed by Doc-Your-Dose Pharmacy were dispensed through the 340B Drug Discount Program.

39.     On September 2, 2014, your affiant received the results of a laboratory analysis conducted on the HIV-related drugs that were seized from Taylor and Landry. The analysis concluded that the drugs and their respective packaging were consistent with the authentic FDA-approved prescription drugs they were labeled as being.

40.     On September 16, 2014, during an interview with your affiant and LA MFCU Investigators, Dr. Walter Campbell stated he did not authorize the prescription issued for the deceased S.M. on June 25, 2012, and that Capital City Clinic, which utilizes electronic medical records, had no record of the prescription.

41.     On November 18, 2014, during an interview with LA MFCU Investigators, NP Joni Nickens was questioned about the two (2) prescriptions she had purportedly written for the deceased patient, A.L. Nickens stated that although the two (2) prescriptions bore her name, she had no recollection of authorizing the prescriptions and her employer, The Caring Clinic, had no record of the two (2) prescriptions being prescribed.

42.     On December 11, 2014, the LA DHH conducted an on-site audit of Doc-Your-Dose Pharmacy located at the SUBJECT PREMISES. During this audit, personnel from the

LA DHH reviewed electronic records stored on computers located within the SUBJECT PREMISES, which are required to be stored for five (5) years pursuant to Louisiana Revised Statutes, Title 46:437.1-46. Additionally, the electronic records reviewed included prescription records for Medicaid recipients, and business records for drug purchases as well as drug invoices and drug inventory records.

43.    On January 15, 2015, the LA MFCU received a summary of the LA DHH Pharmacy Services' final invoice audit of the SUBJECT PREMISES. This invoice audit was conducted by comparing the records of the prescriptions dispensed from January 1, 2013 to December 31, 2013 to the records of the drugs purchased from November 1, 2012 to December 31, 2013. Based on invoices and dispensing reports submitted by Doc-Your-Dose Pharmacy, the LA DHH Pharmacy Services found that Doc-Your-Dose Pharmacy has dispensed and billed Medicaid for $17,080.27 in more drugs than their inventory records supported. The LA DHH auditors also noted that during the execution of their audit, a non-licensed staff member was filling a prescription for a patient, in violation of Louisiana Law, La. R.S. 37:1201. The invoices and dispensing reports which were reviewed in this audit are documents that must be maintained and retained for a period of at least five (5) years, pursuant to Louisiana Revised Statutes, Title 46:437.1-46.

44.    On January 15, 2015, LA MFCU was informed by AmeriHealth Caritas (Louisiana Medicaid Managed Care Organization) of a prescription audit which had been conducted on Doc-Your-Dose Pharmacy located at SUBJECT PREMISES. The audit was conducted by a contracted company, PerformRX, on November 7, 2014. The audit identified 68 prescription discrepancies. The prescription discrepancies discovered include: missing hard-copy patient prescriptions required to be stored; records of prescription data (e.g. name,

20

national provider identification, and DEA number) for a patient conflicted with that same patient's hard copy prescriptions; and patient prescriptions were billed to Medicaid before the prescriptions were issued to the patient. Out of 315 audited claims dated from September 8, 2013 to September 12, 2014, the prescription discrepancies totaled $58,254.00. The PerformRX auditor noted "while many of the prescriptions were for HIV drugs, I could not see any of those drugs on the shelves" and "something was not quite right here." The prescription records and Medicaid claim forms which were reviewed in this audit are documents that must be maintained and retained for a period of at least five (5) years, pursuant to Louisiana Revised Statutes, Title 46:437.1-46.

45.    On February 9, 2015, your affiant again queried the Louisiana Secretary of State's commercial database for information on Doc-Your-Dose Pharmacy, LLC. located at the SUBJECT PREMISES. The database again identified Alvin Watts III as a registered agent and Darlene Brown as an officer of Doc-Your-Dose Pharmacy LLC.

46.    On February 27, 2015, your affiant received the results of a Maryland Motor Vehicle Administration (MVA) database query for Troy Weaver. The database information displayed, in part, Troy Edward Weaver's Maryland driver's license number, his photograph, his date of birth and his place of residence as 8005 Holiday Avenue, Fort Washington, Maryland 20744.

47.    On March 20, 2015, pursuant to a federal grand jury subpoena, Verizon Wireless provided records for the cellular telephone number 301-741-6305. The records showed that telephone number 301-741-6305 was activated by and assigned to Troy Weaver on August 3, 2005 and since its activation, it has never been deactivated or assigned to anyone else. The records identified Troy Weaver's address as 8005 Holiday Avenue, Fort

Washington, Maryland 20744. The records also displayed an incoming call on June 20, 2013 from cellular telephone number 225-385-0364, which lasted for 3 minutes. On October 11, 2013, Alvin Watts' identified telephone number 225-385-0364 as his personal cellular telephone number to a representative of the Louisiana Board of Pharmacy.

48.    On March 23, 2015, your affiant observed wage records obtained from the Louisiana Department of Labor (DOL) confirming Troy Taylor's employment with Doc-Your-Dose Pharmacy located at the SUBJECT PREMISES from 2011 to 2013. The LA DOL records also indicated that Taylor received $33,267.00 in wage earnings from Doc-Your-Dose Pharmacy during the 4th quarter, October, November and December, of 2013.

49.    On March 24, 2015, your affiant received confirmation from the Virginia Board of Pharmacy that Troy Edward Weaver has never been licensed or registered as a wholesale prescription drug distributor by the State of Virginia.

50.    On March 25, 2015, your affiant received confirmation from the Maryland Board of Pharmacy that Troy Edward Weaver has never been licensed or registered as a wholesale prescription drug distributor by the State of Maryland.

51.    On March 27, 2015, your affiant received confirmation from the District of Columbia's Department of Health that Troy Edward Weaver has never been licensed or registered as a wholesale prescription drug distributor by the District of Columbia.

53.    As stated above in paragraph 23, prior to his arrest, Taylor admitted that he had previously made monthly trips to Washington, D.C. to purchase prescription drugs for Watts. An analysis of the Essential Federal Credit Union bank accounts for Alvin Watts III, Broderick Landry, and Troy Taylor revealed that two of Taylor's trips to Washington, D.C. occurred on or around June 20, 2013 and July 19, 2013. Financial transactions identified

travel expenses and cash withdrawals consistent with the dates of these two trips as well as the September 2013 trip to Washington, D.C, in which Taylor and Landry were arrested in Tennessee. Details of the aforementioned financial transactions are identified as follows:

a.      On June 19, 2013, Taylor's debit card was used to rent a vehicle from Enterprise Rental Car in Denham Springs, Louisiana.  On June 20, 2013, Taylor's debit card was used at gasoline station in Hollins, Virginia and at Capitol Skyline Hotel in Washington D.C.  On June 21, 2013, Taylor's debit card was used at Shell Oil in Woodbridge, Virginia and on June 22nd there was a transaction at Chevron in Hope Hull, Alabama.

b.      On July 17, 2013, Taylor's debit card was used to rent a vehicle from Enterprise Rental Car in Baton Rouge, Louisiana.  On the same date, $11,000.00 in cash was withdrawn from Taylor's account. On July 19, 2013, Taylor's debit card was used at a gasoline station in Wytheville, Virginia and at Capitol Skyline Hotel in Washington D.C.

c.      On September 11, 2013, Taylor's debit card was used to rent a vehicle from Enterprise Rental Car in Baker, Louisiana.   On the same date, $6,500.00 was transferred from Watt's account to Landry's account and then withdrawn from Landry's account in cash. On the same date, another $7,000.00 in cash was withdrawn from Watt's account.  On September 12, 2013, Taylor and Landry were stopped and arrested in Tennessee on their return trip from Washington, D.C.

23

## DEFINITIONS OF TECHNICAL TERMS

54.     The following definitions apply to this Affidavit and its Attachments:

a.      "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

c.      "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically-stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

24

d.     A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## EXECUTION OF SEARCHES FOR COMPUTER EVIDENCE

55.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

56.     I submit that, with regards to computers and storage mediums found at the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, experience, and information I have gained from other agents involved in the forensic examination of computers, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., in space on the storage medium that is not currently being used by an active file, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

57.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

26

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

c.      In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user

27

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

d.     The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

e.     Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

f.     Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or

28

cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.

g.      Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

h.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

i.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge

about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

j.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

58.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premise for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.      *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.

Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

59.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not

limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

CONCLUSION

60.     Based upon the facts set forth in this affidavit, as well as my training and experience, your affiant believes there is probable cause to believe that Alvin Watts III has engaged in a systematic pattern of fraudulent schemes by purchasing, repackaging and dispensing illegally obtained prescription drugs, creating and/or forging prescriptions, submitting fraudulent claims to Medicaid and together with others known and unknown, knowingly combined, conspired, and committed health care fraud, in violation of Title 18, , United States Code, Section 1347.  There is also probable cause that Troy Edward Weaver has engaged in unlicensed wholesaling of prescription drugs in interstate commerce, and failure to provide drug pedigrees for the drugs he sold, in violation of Title 21, United States Code, Section 331(t).  Additionally, there is also probable cause to believe that Weaver, Taylor and Landry introduced misbranded drugs into interstate commerce, in violation of Title 21, United States Code, Section 331(a); and that Watts, Weaver, Taylor and Landry have conspired to violate Title 21, United States Code, Section 331(a) (introduce misbranded drugs into interstate commerce, from Washington, DC to Louisiana),  Title 21, United States Code, Section 331(k) (perform acts which resulted in drugs becoming misbranded while held for sale after their shipment in interstate commerce), and Title 21, United States Code, Section 331(t)(unlicensed wholesaling of prescription drugs), in violation of Title 18, United States Code, Section 371.  Finally, there is probable cause to believe that computers,

documents, other records, and other evidence, fruits and instrumentalities of those violations, as described in Attachment B, will be found at the SUBJECT PREMISES.

61.     Wherefore your affiant respectfully requests the court to find probable cause and issue a search warrant authorizing the search of the SUBJECT PREMISES located at 17275 Highway 77, Grosse Tete, LA 70740, for the violations described above, and for the evidence detailed on Attachment B.

62.     It is requested that the warrant and accompanying affidavit and application in support thereof, as they reveal an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against potential flight, and better ensure the safety of agents and others, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of the FDA/OCI, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.

_____
Alex S. Davis, Special Agent
Food and Drug Administration
Office of Criminal Investigations


Sworn to and subscribed before me this __4th__ day of May, 2015.


_____
RICHARD L. BOURGEOIS, JR.
UNITED STATES MAGISTRATE JUDGE

33

# ATTACHMENT A

## Property to Be Searched

The property to be searched at 17275 Highway 77, Grosse Tete, LA 70740, is a one-story building known as the business named Doc-Your-Dose Pharmacy.  The building has a tan or light brown colored paneling exterior with green colored fascia and a single-pitch asphalt shingled roof.  A green and white colored sign is hung above the business' front door entrance bearing, in-part, the business' name, Doc-Your-Dose Pharmacy.  The building is located on the east side of Highway 77, approximately 135 feet north of Sexton Lane. The rear of the building faces Bayou Grosse Tete and the business' front door faces Highway 77. A limestone covered parking area is located to the front of the business between the building and Highway 77. A photograph of the property is included below.



## ATTACHMENT B

### Items to be seized:

Items to be searched for and seized include any fruits, contraband, evidence, and instrumentalities of violations of Title 21, United States Code, Sections 331(a) (Introduction of Misbranded drugs into Interstate Commerce), 331(k) (Doing an Act which Results in Drugs being Misbranded While Held for Sale), and 331(t) (Unlicensed Wholesaling of Prescription Drugs and Failure to Provide a Pedigree for Drugs Sold); Title 18, United States Code, Section 371 (Conspiracy); and Title 18, United States Code, Section 1347 (Health Care Fraud), including the following:

1.     All records, in whatever format they were created or are stored, dated from November 1, 2012, to the present, pertaining to the financing, purchase, possession, sale, proceeds or investment of proceeds pertaining to the distribution of diverted prescription drugs, fraudulent prescriptions and fraudulent Medicaid reimbursement, and including:

a.     lists of customers and related identifying information; types, amounts, and prices of diverted prescription drugs purchased, as well as dates, places, and amount of specific transactions; and any information related to sources of illegally diverted prescription drugs (including names, addresses, phone numbers, or any other identifying information);

b.     business records, such as accounting ledgers, financial statements, transaction books, notes, memos, spread sheets, bank records, income tax records, wire transfers, checks, checkbooks, canceled checks, payroll checks, bank statements, deposit, withdrawal slips, check vouchers or check stubs,

1

credit card records, credit card machines, Pay Pal records, account information, letters of credit, money orders, cashier's checks, invoices, and all receipts;

c.      evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of proceeds obtained from diverted prescription drug distribution and health care fraud activities;

d.      storage facility documentation; P.O. Box documentation; safe deposit box documentation;

e.      records of telephone numbers, address books, or papers which reflect names, addresses, and/or telephone numbers of storage facilities, customers, suppliers, and investors;

f.      travel records of any type; to include vehicle rental agreements; gas receipts; airline ticket information; toll receipts; and traffic and parking citations;

g.      employee timesheets, employee files, employee payments, payroll documentation, employee schedules; and due diligence files including employee research and background checks;

k.      prescription drug inventory records, acquisition records and purchasing records, to include: records of all prescription drugs procured, the quantity received and the name; address and wholesale distributor license number of the person from whom the drugs were procured; wholesaler drug invoices; drug receipts; drug pedigrees; prescription drug transfers to/from other

2

pharmacies; any return(s) or credit(s) reports issued to the pharmacy and all drug orders and records relating to the practice of the pharmacy;

h.     records of prescription drugs shipped out or received thru US Postal Service as well as any other commercial freight carrier(s) to include UPS, FedEx, DHL; bills of lading, packing lists, and shipping records;

l.     records of signature logs of customers picking up prescriptions (as proof of receipt) for prescriptions billed to third-party programs;

m.     records of prescription deliveries to customers, including manifests of personnel delivering prescriptions to customers that were billed through third-party programs;

n.     any and all Medicaid claim forms and any documents that are attached; Professional records, such as patient treatment plans and patient records; Prior and post authorization, and service authorization information; Prescription records for Medicaid as well as those for all other patients (including Medicare, private pay and cash); Business records, such as accounting ledgers, financial statements, purchase/acquisition records, invoices, inventory records, check registers, canceled checks, sales records, etc.; Tax records, including purchase documentation; and Provider enrollment documentation.

o.     all Louisiana Board of Pharmacy newsletters, provider manuals, provider updates and any other correspondence from the Louisiana Board of Pharmacy, Louisiana Department of Health and Hospitals or Molina; written policies and procedures along with any regulatory compliance records and communications with federal, state and local authorities;

p.      records and documentation of remittance devices detailing claims,

adjusted claims and Medicaid payments and Medicaid prescription billing

transmission documents.

2.      The following may be seized, copied, and searched for all items listed in

paragraph 1 above:

a.      Computer hardware, including any and all computer equipment.

Included within the definition of computer hardware are any electronic devices

capable of data processing (such as central processing units, laptop or

notebook computers, personal digital assistants, gaming consoles, and wireless

communication devices to include cellular telephone devices capable of

internet access); peripheral input/output devices (such as keyboards, printers,

scanners, plotters, monitors, and drives intended for removable media); related

communications devices (such as modems, cables and connections); storage

media as defined below; and data security devices as defined below.

b.      Computer software, meaning any and all data, information,

instructions, programs, or program codes, stored in the form of electronic,

magnetic, optical, or other media, which is capable of being interpreted by a

computer or its related components.  Computer software may also include

data, data fragments, or control characters integral to the operation of

computer software, such as operating systems software, applications software,

utility programs, compilers, interpreters, communications software, and other

programming used or intended to be used to communicate with computer

components.

4

c.      Computer-related documentation, meaning any written, recorded, printed, or electronically stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

d.      Data security devices, meaning any devices, programs or data – whether themselves in the nature of hardware of software – that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any computer hardware, computer software, computer-related documentation, or electronic data records.  Such items include, but are not limited to, user names and passwords; data security hardware (such as encryption devices, chips, and circuit boards); data security software or information (such as test keys and encryption codes); and similar information that is required to access computer programs or data or to otherwise render programs or data into usable form.

e.      All storage media capable of collecting, storing, maintaining, retrieving, concealing, transmitting, and backing up electronic data.  Included within this paragraph is any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment, such as fixed hard disks, external hard disks, removable hard disks (including micro drives), floppy diskettes, compact discs (CDs), digital video discs (DVDs), tapes, optical storage devices, laser discs, thumb drives, iPods, digital cameras, memory cards (e.g. CF or SD cards), internet-connecting gaming consoles (e.g., Playstations, Xboxes, etc.), or other memory storage devices.

5

3.     The above seizure of computer and related items constituting instrumentalities of crime may require those items be removed and examined in an appropriately controlled laboratory setting if the agent deems it necessary in order to conduct an efficient, complete, secure, and accurate search.



AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Louisiana

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>IN THE MATTER OF THE SEARCH OF DOC-YOUR-DOSE<br>PHARMACY LOCATED AT 17275 HIGHWAY 77,<br>GROSSE TETE, LOUISIANA 70740 | )<br>)<br>)  Case No.   15- 𝑚𝑗 - 𝑈𝑁𝐴<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the      Middle      District of      Louisiana
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before      May 17, 2015
                                                                                                                                                  *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.          ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Richard L. Bourgeois, Jr.
                                            *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for          days *(not to exceed 30)*.
                                                                    ☐ until, the facts justifying, the later specific date of

Date and time issued:   May 4, 2015 at 4:45pm                    _____
                                                                                                              *Judge's signature*

City and state:    Baton Rouge, LA                                  Richard L. Bourgeois, Jr., Magistrate Judge
                                                                                          *Printed name and title*

## ATTACHMENT A

### Property to Be Searched

The property to be searched at 17275 Highway 77, Grosse Tete, LA 70740, is a one-story building known as the business named Doc-Your-Dose Pharmacy. The building has a tan or light brown colored paneling exterior with green colored fascia and a single-pitch asphalt shingled roof. A green and white colored sign is hung above the business' front door entrance bearing, in-part, the business' name, Doc-Your-Dose Pharmacy. The building is located on the east side of Highway 77, approximately 135 feet north of Sexton Lane. The rear of the building faces Bayou Grosse Tete and the business' front door faces Highway 77. A limestone covered parking area is located to the front of the business between the building and Highway 77. A photograph of the property is included below.



# ATTACHMENT B

## Items to be seized:

Items to be searched for and seized include any fruits, contraband, evidence, and instrumentalities of violations of Title 21, United States Code, Sections 331(a) (Introduction of Misbranded drugs into Interstate Commerce), 331(k) (Doing an Act which Results in Drugs being Misbranded While Held for Sale), and 331(t) (Unlicensed Wholesaling of Prescription Drugs and Failure to Provide a Pedigree for Drugs Sold); Title 18, United States Code, Section 371 (Conspiracy); and Title 18, United States Code, Section 1347 (Health Care Fraud), including the following:

1.      All records, in whatever format they were created or are stored, dated from November 1, 2012, to the present, pertaining to the financing, purchase, possession, sale, proceeds or investment of proceeds pertaining to the distribution of diverted prescription drugs, fraudulent prescriptions and fraudulent Medicaid reimbursement, and including:

     a.      lists of customers and related identifying information; types, amounts, and prices of diverted prescription drugs purchased, as well as dates, places, and amount of specific transactions; and any information related to sources of illegally diverted prescription drugs (including names, addresses, phone numbers, or any other identifying information);

     b.      business records, such as accounting ledgers, financial statements, transaction books, notes, memos, spread sheets, bank records, income tax records, wire transfers, checks, checkbooks, canceled checks, payroll checks, bank statements, deposit, withdrawal slips, check vouchers or check stubs,

1

credit card records, credit card machines, Pay Pal records, account information, letters of credit, money orders, cashier's checks, invoices, and all receipts;

c.      evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of proceeds obtained from diverted prescription drug distribution and health care fraud activities;

d.      storage facility documentation; P.O. Box documentation; safe deposit box documentation;

e.      records of telephone numbers, address books, or papers which reflect names, addresses, and/or telephone numbers of storage facilities, customers, suppliers, and investors;

f.      travel records of any type; to include vehicle rental agreements; gas receipts; airline ticket information; toll receipts; and traffic and parking citations;

g.      employee timesheets, employee files, employee payments, payroll documentation, employee schedules; and due diligence files including employee research and background checks;

k.      prescription drug inventory records, acquisition records and purchasing records, to include: records of all prescription drugs procured, the quantity received and the name; address and wholesale distributor license number of the person from whom the drugs were procured; wholesaler drug invoices; drug receipts; drug pedigrees; prescription drug transfers to/from other

pharmacies; any return(s) or credit(s) reports issued to the pharmacy and all drug orders and records relating to the practice of the pharmacy;

h.      records of prescription drugs shipped out or received thru US Postal Service as well as any other commercial freight carrier(s) to include UPS, FedEx, DHL; bills of lading, packing lists, and shipping records;

l.      records of signature logs of customers picking up prescriptions (as proof of receipt) for prescriptions billed to third-party programs;

m.      records of prescription deliveries to customers, including manifests of personnel delivering prescriptions to customers that were billed through third-party programs;

n.      any and all Medicaid claim forms and any documents that are attached; Professional records, such as patient treatment plans and patient records; Prior and post authorization, and service authorization information; Prescription records for Medicaid as well as those for all other patients (including Medicare, private pay and cash); Business records, such as accounting ledgers, financial statements, purchase/acquisition records, invoices, inventory records, check registers, canceled checks, sales records, etc.; Tax records, including purchase documentation; and Provider enrollment documentation.

o.      all Louisiana Board of Pharmacy newsletters, provider manuals, provider updates and any other correspondence from the Louisiana Board of Pharmacy, Louisiana Department of Health and Hospitals or Molina; written policies and procedures along with any regulatory compliance records and communications with federal, state and local authorities;

  p.  records and documentation of remittance devices detailing claims, adjusted claims and Medicaid payments and Medicaid prescription billing transmission documents.

2.  The following may be seized, copied, and searched for all items listed in paragraph 1 above:

  a.  Computer hardware, including any and all computer equipment. Included within the definition of computer hardware are any electronic devices capable of data processing (such as central processing units, laptop or notebook computers, personal digital assistants, gaming consoles, and wireless communication devices to include cellular telephone devices capable of internet access); peripheral input/output devices (such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media); related communications devices (such as modems, cables and connections); storage media as defined below; and data security devices as defined below.

  b.  Computer software, meaning any and all data, information, instructions, programs, or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by a computer or its related components.  Computer software may also include data, data fragments, or control characters integral to the operation of computer software, such as operating systems software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended to be used to communicate with computer components.

4

c.      Computer-related documentation, meaning any written, recorded, printed, or electronically stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

d.      Data security devices, meaning any devices, programs or data – whether themselves in the nature of hardware of software – that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any computer hardware, computer software, computer-related documentation, or electronic data records. Such items include, but are not limited to, user names and passwords; data security hardware (such as encryption devices, chips, and circuit boards); data security software or information (such as test keys and encryption codes); and similar information that is required to access computer programs or data or to otherwise render programs or data into usable form.

e.      All storage media capable of collecting, storing, maintaining, retrieving, concealing, transmitting, and backing up electronic data. Included within this paragraph is any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment, such as fixed hard disks, external hard disks, removable hard disks (including micro drives), floppy diskettes, compact discs (CDs), digital video discs (DVDs), tapes, optical storage devices, laser discs, thumb drives, iPods, digital cameras, memory cards (e.g. CF or SD cards), internet-connecting gaming consoles (e.g., Playstations, Xboxes, etc.), or other memory storage devices.

5

3.      The above seizure of computer and related items constituting instrumentalities of crime may require those items be removed and examined in an appropriately controlled laboratory setting if the agent deems it necessary in order to conduct an efficient, complete, secure, and accurate search.